Case No. 22-13643

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

JAMIE H. PIZARRO, CRAIG SMITH, JERRY MURPHY, RANDALL IDEISHI,
GLENDA STONE, RACHELLE NORTH, on behalf of themselves and others
similarly situated, and MARIE SILVER,

*Plaintiffs-Appellants*,

v.

THE HOME DEPOT, INC., THE ADMINISTRATIVE COMMITTEE OF THE
HOME DEPOT FUTUREBUILDER 401(K) PLAN, AND THE INVESTMENT
COMMITTEE OF THE HOME DEPOT FUTUREBUILDER 401(K) PLAN,

*Defendants-Appellees*.

Appeal from the United States District Court for the Northern District of Georgia

Case No. 1:18-CV-01566-SDG (Hon. Steven D. Grimberg)

_____

**BRIEF FOR PLAINTIFFS-APPELLANTS**

_____

David Tracey
**SANFORD HEISLER SHARP, LLP**
1350 Ave. of the Americas, 31st Floor
New York, NY 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
dtracey@sanfordheisler.com

Leigh Anne St. Charles
**SANFORD HEISLER SHARP, LLP**
611 Commerce Street, Suite 3100
Nashville, TN 37203
Telephone: (615) 434-7000
Facsimile: (615) 434-7020
lstcharles@sanfordheisler.com

*Counsel continued on inside cover*

Charles Field
**SANFORD HEISLER SHARP, LLP**
2550 Fifth Avenue, 11th Floor
San Diego, CA 92103
Telephone: (619) 577-4253
Facsimile: (619) 577-4250
cfield@sanfordheisler.com

T. Brandon Welch
**STILLMAN WELCH, LLC**
3453 Pierce Drive, Suite 150
Chamblee, GA 30341
Telephone: (404) 895-9040
Facsimile: (404) 907-1819
brandon@stillmanwelch.com

*Counsel for Plaintiffs-Appellants*

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and Eleventh Circuit Rule 26.1-1, the undersigned hereby certifies that none of the Plaintiffs-Appellants are corporate parties.

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1(a), the undersigned provides the following *amended* certificate of interested persons or entities (additions noted in bold):

1.  Blouw, Nicholas De (attorney for Appellants)

2.  Blumenthal Nordrehaug Bhowmik De Blouw, LLP (law firm for Appellants)

3.  Blumenthal, Norman Bernard (attorney for Appellants)

4.  Brockman, W. Bard (attorney for *amicus curiae* for Appellees in the district court)

5.  Bryan Cave Leighton Paisner LLP (law firm for *amicus curiae* for Appellees in the district court)

6.  Chamber of Commerce of the United States of America (*amicus curiae* for Appellees in the district court)

7.  Chapin, Edward Dewey (attorney for Appellants)

8.  Chattin, Danielle (attorney for Appellees)

9.  **Dameron, Charles S. (attorney for Appellees)**

**10.  Doneff, Andrea (Circuit Mediator, Kinnard Mediation Center)**

11.  Field, Charles Henry (attorney for Appellants)

12.  Grimberg, Steven Daniel (United States District Judge)

13.  Home Depot U.S.A., Inc. (subsidiary of Appellee)

14.  Ideishi, Randall (Appellant)

15.  King & Spalding LLP (law firm for Appellees)

**16.  Latham & Watkins LLP (law firm for Appellees)**

**17.  Martinez, Roman (attorney for Appellees)**

18.  May, Leigh Martin (United States District Judge)

19.  Melzer, Andrew (attorney for Appellants)

**20.  Murphy, Brent T. (attorney for Appellees)**

21.  Murphy, Jerry (Appellant)

22.  North, Rachelle (Appellant)

23.  O'Melveny & Myers LLP (law firm for *amicus curiae* for Appellees in the district court)

24.  Ouellette, Sean (attorney for Appellants)

25.  Pizarro, Jamie H. (Appellant)

26.  Ray II, William M.  (United States District Judge)

27.  Rice, Deanna M. (attorney for *amicus curiae* for Appellees in the district court)

28. Sanford Heisler Sharp, LLP (law firm for Appellants)

29. Sanford, David (attorney for Appellants)

30. Sharp, Kevin Hunter (attorney for Appellants)

31. Shuler, Darren A. (attorney for Appellees)

32. Silver, Marie (Appellant)

33. Smith, Craig (Appellant)

34. St. Charles, Leigh Anne (attorney for Appellants)

35. Stillman Welch, LLC (law firm for Appellants)

36. Stone, Glenda (Appellant)

37. Tetrick, Jr. David (attorney for Appellees)

38. The Administrative Committee of the Home Depot FutureBuilder 401(K) Plan (Appellee)

39. The Home Depot, Inc. (NYSE: HD) (Appellee)

40. The Investment Committee of the Home Depot FutureBuilder 401(K) Plan (Appellee)

41. Tracey, David H. (attorney for Appellants)

42. VerGow, Meaghan (attorney for *amicus curiae* for Appellees in the district court)

43. Watson, Benjamin Bruce (attorney for Appellees)

44. Welch, T. Brandon (attorney for Appellants)

Dated: February 3, 2023          <u>*/s/ David Tracey*</u>
                                 David Tracey

                                 *Counsel for Plaintiffs-Appellants*

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Plaintiffs-Appellants request oral argument in this matter. This certified class action involves important legal and factual questions concerning the proper application of ERISA's fiduciary duties. Plaintiffs-Appellants respectfully submit that due to the significance of the issues raised on appeal, oral argument will assist the Court in addressing the questions presented.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ..................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

TABLE OF CITATIONS ..................................................................................... v

INTRODUCTION ................................................................................................ 1

STATEMENT OF JURISDICTION .................................................................... 3

STATEMENT OF THE ISSUES .......................................................................... 4

STATEMENT OF THE CASE .............................................................................. 6

   I.   Factual Background ................................................................................... 7

      A. The Plan and its Fiduciaries ................................................................ 7

      B. The Excessive Fees Claim: Defendants Allowed FE and AFA to Charge
         Excessive Fees ...................................................................................... 7

         1. FE's and AFA's Fee-Rates Were Excessive ............................................ 9

         2. Defendants Failed to Discuss or Evaluate FE and AFA's Fees ..............10

      C. The Challenged Funds Claims: Defendants Retained Imprudent
         Investments ........................................................................................11

         1. The BlackRock Funds ........................................................................12

         2. The JPM Fund .....................................................................................13

         3. The TS&W Fund ..................................................................................14

         4. Stephens Fund ....................................................................................15

   II.   Procedural Background ..........................................................................16

   III.  Standard of Review ...............................................................................19

SUMMARY OF ARGUMENT ..........................................................................20

I.    The Court Failed To Hold Defendants To Their Burden On Causation ........21

II.   The Court Ignored Plaintiffs Arguments For Equitable Relief .....................21

III.  The Court Discounted or Disregarded Plaintiffs' Evidence of Causation .....22

IV.   The Court Inappropriately Weighed the Evidence Concerning Defendants' Process for Monitoring the Stephens Fund ...................................................24

ARGUMENT ........................................................................................................25

I.    ERISA's Standard of Care.................................................................................25

II.   The District Court Erred by Holding That Plaintiffs Would Bear the Burden of Proof on the Element of Causation ...........................................................26

III.  Plaintiffs Never "Waived" Claims for Equitable Relief ...............................30

IV.   Plaintiffs Established Material Disputes of Fact as to Causation .................32

V.    Plaintiffs Presented Ample Evidence that the Plan Paid Excessive Fees to FE and AFA for Managed Accounts Services .....................................................33

      A. Alternative Providers Offered Comparable Services for Lower Fees.......34

      B. FE and AFA Charged Lower Rates to Most Similar Plans ......................38

      C. FE Payments to Aon were Excessive ......................................................40

VI.   Plaintiffs Established Disputes as to Causation on the Challenged Funds Claims ...............................................................................................................42

      A. The BlackRock Funds.............................................................................42

         1. Plaintiffs' Evidence of Underperformance ...........................................42

         2. The District Court Ignored and Weighed Plaintiffs' Evidence..............44

         3. The Court Applied the Wrong Standard ...............................................47

      B. The JPM Fund.........................................................................................48

      C. The TS&W Fund .....................................................................................51

      D. The Stephens Fund..................................................................................54

iii

VII. Plaintiffs Established Disputes of Fact as to Defendants' Process for Monitoring the Stephens Fund ........................................................56

CONCLUSION ............................................................................................58

CERTIFICATE OF COMPLIANCE..........................................................60

CERTIFICATE OF SERVICE ...................................................................61

iv

## <u>TABLE OF CITATIONS</u>

CASES                                                                PAGE(S)

*Atlanta J. & Const. v. City of Atlanta Dep't of Aviation*,
 442 F.3d 1283 (11th Cir. 2006) ...........................................................19

\* *Brock v. Robbins*,
 830 F.2d 640 (7th Cir. 1987) ............................................. 21, 26, 31

\* *Brotherston v. Putnam Invs.*, LLC,
 907 F.3d 17 (1st Cir. 2018)................................................... 27, 28, 46

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986)........................................................................29

\* *CIGNA Corp. v. Amara*,
 563 U.S. 421 (2011)................................................................. 22, 31

\* *Clark v. Coats & Clark, Inc.*,
 929 F.2d 604 (11th Cir. 1991) ................................................ 22, 32

*Donovan v. Mazzola*,
 716 F.2d 1226 (9th Cir. 1983) ........................................................31

*Ellis v. Fid. Mgmt. Tr. Co.*,
 883 F.3d 1 (1st Cir. 2018)........................................................ 50, 51

*Fink v. Nat'l Sav. & Tr. Co.*,
 772 F.2d 951 (D.C. Cir. 1985)............................................. 25, 26, 31

*Fowler v. OSP Prevention Grp., Inc.*,
 38 F.4th 103 (11th Cir. 2022) ........................................................19

*George v. Kraft Foods Glob., Inc.*,
 641 F.3d 786 (7th Cir. 2011) .................................................... 25, 58

\* *GIW Indus. v. Trevor, Stewart, Burton & Jacobsen*,
 895 F.2d 729 (11th Cir. 1990) ................................................ *passim*

v

*Gregg v. Transp. Workers of Am. Int'l*,
　343 F.3d 833 (6th Cir. 2003) ........................................................................ 26, 58

*Herman v. NationsBank Tr. Co., (Georgia)*,
　126 F.3d 1354 (11th Cir. 1997) ................................................................. *passim*

*Hillcrest Prop., LLC v. Pasco Cnty.*,
　754 F.3d 1279 (11th Cir. 2014) ........................................................................19

*\* Hughes v. Nw. Univ.*,
　142 S. Ct. 737 (2022) ................................................................................ *passim*

*\* In re Unisys Sav. Plan Litig.*,
　74 F.3d 420 (3d Cir. 1996) ....................................................................... *passim*

*Katsaros v. Cody*,
　744 F.2d 270 (2d Cir. 1984) ........................................................................ 20, 25

*Kuper v. Iovenko*,
　66 F.3d 1447 (6th Cir. 1995) ............................................................................28

*\* Martin v. Feilen*,
　965 F.2d 660 (8th Cir. 1992) ............................................................... 2, 28, 29

*McDonald v. Provident Indem. Life Ins. Co.*,
　60 F.3d 234 (5th Cir. 1995) ........................................................................ 27, 28

*\* Moore v. GEICO Gen. Ins. Co.*,
　633 F. App'x 924 (11th Cir. 2016)............................................................ *passim*

*Peabody v. Davis*,
　636 F.3d 368 (7th Cir. 2011) ............................................................................28

*Pioneer Centres Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*,
　858 F.3d 1324 (10th Cir. 2017) ........................................................................28

*Pledger v. Reliance Tr. Co.*,
　240 F. Supp. 3d 1314 (N.D. Ga. 2017).............................................................25

*Preis v. Lexington Ins. Co.*,
    279 F. App'x 940 (11th Cir. 2008)......................................................19

*Sacerdote v. New York Univ.*,
    9 F.4th 95 (2d Cir. 2021) .................................................................27

*Saumer v. Cliffs Natural Resources Inc.*,
    853 F.3d 855 (6th Cir. 2017) ...........................................................28

*Shaw v. Conn. Gen. Life Ins. Co.*,
    353 F.3d 1276 (11th Cir. 2003) ................................................. 40, 50

*Smith v. R.J. Reynolds Tobacco Co.*,
    880 F.3d 1272 (11th Cir. 2018) .......................................................19

\* *Strickland v. Norfolk S. Ry. Co.*,
    692 F.3d 1151 (11th Cir. 2012) ............................................... *passim*

*Sweda v. Univ. of Penn.*,
    923 F.3d 320 (3d Cir. 2019) ...................................................... 20, 25

\* *Tatum v. RJR Pension Inv. Comm.*,
    761 F.3d 346 (4th Cir. 2014) ................................................... *passim*

*Tibble v. Edison Int'l*,
    843 F.3d 1187 (9th Cir. 2016) .................................................. 20, 25

\* *Tibble v. Edison, Int'l*,
    575 U.S. 523 (2015)........................................................... 25, 27, 30

*Tippens v. Celotex Corp.*,
    805 F.2d 949 (11th Cir. 1986) .................................................. 46, 49

\* *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in State of Ala.*, 941 F.2d 1428 (11th Cir. 1991) .................................... *passim*

\* *Willett v. Blue Cross & Blue Shield of Alabama*,
    953 F.2d 1335 (11th Cir. 1992) ............................................... *passim*

*Wright v. Oregon Metallurgical Corp.*,
    360 F.3d 1090 (9th Cir. 2004) ...........................................................................28


**S**TATUTES AND **R**EGULATIONS

17 C.F.R. § 275.206(4)-1 ..................................................................... 53, 55

29 C.F.R. § 2550.404a-1 .................................................................................26

28 U.S.C. § 1291 ...............................................................................................3

28 U.S.C. § 1331 ...............................................................................................3

29 U.S.C. § 1001 ...........................................................................................1, 3

29 U.S.C. § 1104 ..................................................................................... 1, 6, 25

29 U.S.C. § 1109 ................................................................................... *passim*

29 U.S.C. § 1132 ..................................................................................... 3, 6, 31


**O**THER **A**UTHORITIES

2 McCormick On Evid. § 337..........................................................................28

Restatement (Third) of Trusts § 100 (2012) ...............................................27

## **INTRODUCTION**

Congress enacted the Employee Retirement Income Security Act of 1974 ("ERISA") to promote "the continued well-being and security of millions of employees." 29 U.S.C. § 1001. Based on its recognition that employer-based retirement plans "are affected with a national public interest" (*id.*), Congress imbued the statute with "the highest [duties] known to law." *Herman v. NationsBank Tr. Co., (Georgia)*, 126 F.3d 1354, 1361 (11th Cir. 1997). Few cases so embody those profound public purposes as this one.

With over $9 billion in retirement savings for over 200,000 employees, the Home Depot FutureBuilder Plan (the "Plan") is one of the largest 401(k) plans in America.[1] Yet, Defendants—the Plan's fiduciaries—failed to act with the "care, skill, prudence, and diligence" that ERISA requires. 29 U.S.C. § 1104(a)(1)(B). Specifically, Defendants allowed two "managed accounts" providers to charge participants excessive fees (the "Excessive Fees" claim) and failed to remove grossly imprudent investments (the "Challenge Funds" claims). As a result, employees lost hundreds of millions in retirement savings.

In the order on appeal, the district court properly found genuine disputes as to whether Defendants breached their duty to prudently monitor the managed accounts

---

[1] Doc. 265-2 at 2-3 (¶¶ 2-3). Record citations are to ECF-generated pagination.

1

providers and all but one of the Challenged Funds.[2] Yet, the court granted summary judgment, and dismissed these claims, on the purported ground that Plaintiffs could not establish causation.

Ordinarily, "[c]ourts do not take kindly to arguments by fiduciaries who have breached their obligations that, if they had not done this, everything would have been the same." *Martin v. Feilen*, 965 F.2d 660, 672 (8th Cir. 1992) (citation omitted). But the district court did. It got there by applying the wrong standard on causation; inappropriately dismissing Plaintiffs' claims for equitable relief; and both ignoring and weighing evidence, including expert testimony. The court made similar missteps for the one investment where it found no breach. Absent these errors, this is an easy case. Defendants failed to act like prudent investors with $9 billion of retirement savings at stake. Consequently, they made disastrous decisions that diminished employees' nest eggs. The record warrants—and the participants deserve—a trial.

This Court should reverse.

---

[2] Doc. 343 at 47-97.

## <u>STATEMENT OF JURISDICTION</u>

The district court had jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1) because this action arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"), and is brought under 29 U.S.C. § 1132(a)(2) and (3).

The Court of Appeals has jurisdiction pursuant to 28 U.S.C. § 1291 over the final judgment entered by the district court on September 30, 2022 (Doc. 344), including amendments thereto filed on October 4, 2022 and October 14, 2022 (Docs. 345-346). The final judgment disposes of all parties' claims. Plaintiffs-Appellants timely filed their notice of appeal on October 26, 2022 (Doc 348).

## STATEMENT OF THE ISSUES

1)      Did the district court err by granting summary judgment on the element of causation without first finding that Defendants had met their burden to "establish the absence of causation by proving that [Plaintiffs'] claimed losses could not have resulted from" the fiduciary breaches? *Willett v. Blue Cross & Blue Shield of Alabama*, 953 F.2d 1335, 1343 (11th Cir. 1992). Doc. 343 at 43-45.

2)      Did the court err by holding that Plaintiffs had "waived" all claims for equitable relief even though Plaintiffs: (1) explicitly sought equitable relief (including surcharge and injunction); and (2) defeated Defendants' only argument against injunctive relief by demonstrating disputes of material fact as to breaches of fiduciary duty? Doc. 343 at 50.

3)      Did the court err by granting judgment on the Excessive Fees claim for purported lack of causation where evidence, including expert testimony, showed that the Plan's "managed accounts" providers charged the Plan higher rates than they charged comparable plans, charged higher rates than comparable service providers, and paid a kickback to the Plan's recordkeeper? *Id.* at 51-61.

4)      Did the court err by granting judgment on the Challenged Funds claims for purported lack of causation where the Funds grossly underperformed their objectives and Plaintiffs' expert testified that a prudent fiduciary would have removed them? *Id.* at 61-96.

4

5)      Did the court err by granting judgment on the Stephens Fund claim based on Plaintiffs' purported failure to show procedural imprudence where the evidence demonstrated that Defendants failed to investigate the causes of the Fund's underperformance and retained it long after a prudent fiduciary would have removed it? *Id.* at 93-95.

## STATEMENT OF THE CASE

Plaintiffs brought this class action under ERISA, 29 U.S.C. §§ 1132(a)(2)-(3), to challenge the mismanagement of their retirement plan. Plaintiffs allege that Defendants breached ERISA's duty of prudence through two sets of imprudent acts. *See* 29 U.S.C. § 1104(a)(1)(B).

First, Defendants allowed two "managed accounts" providers, Financial Engines Advisors LLC (FE) and Alight Financial Advisors LLC (AFA), to charge Plan participants excessive fees for their advisory services (the "Excessive Fees" claim).[3]

Second, Defendants failed to timely remove imprudent investments (the "Challenged Funds" claim)—specifically, several BlackRock Life Path Target Date Funds ("BlackRock Funds"), the TS&W Small Cap Value Fund ("TS&W Fund"), the Stephens Small Cap Growth Fund ("Stephens Fund"), and the J.P. Morgan Stable Value Fund ("JPM Fund").[4]

As a result of Defendants' breaches, Plan participants lost hundreds of millions of dollars in retirement savings.[5]

---

[3] Doc. 53 at 14-29, 91-95 (¶¶ 34-73, 176-186).

[4] *Id.* at 29-81, 87-91 (¶¶ 74-151, 160-175).

[5] Doc. 250-13 at 28-45 (¶¶ 75, 81, 86, 94, 98, 102, 109, 113, 117, 125, 129, 133, 135, 138, 145).

## I.   Factual Background

### A. The Plan and its Fiduciaries

The Plan is a defined-contribution retirement plan for Home Depot employees.[6] Participants save for retirement by investing part of their earnings through a limited "menu" of investment options curated by the Plan's fiduciaries.[7]

The Plan's fiduciaries include Defendants The Home Depot, Inc., the Investment Committee ("IC"), and the Administrative Committee ("AC").[8] Home Depot sits atop the fiduciary structure and its Board appoints the members of both Committees.[9] The IC's duties include selecting and monitoring the Plan's investments (including the Challenged Funds) and service providers (including FE and AFA).[10] The AC is the Plan "administrator" and a named fiduciary.[11]

### B. The Excessive Fees Claim: Defendants Allowed FE and AFA to Charge Excessive Fees

In 2011, the IC engaged FE to provide investment advisory services to Plan participants through a program called Professional Management.[12] Professional

---

[6] Doc. 270-1 at 2 (¶ 2).

[7] *Id.* (¶ 3).

[8] Doc. 265-2 at 3 (¶ 4); Doc. 245-6 at 79, 82, 84.

[9] Doc. 245-6 at 79, 82, 84.

[10] Doc. 265-2 at 4-5 (¶¶ 6-7).

[11] Doc. 245-6 at 79.

[12] Doc. 265-2 at 96 (¶ 138).

Management is a "managed accounts" program. When a participant enrolls, FE takes control of his/her account and selects the participant's investments from the Plan's investment menu.[13] FE uses a computer algorithm to make these allocation decisions.[14] On July 1, 2017, AFA formally replaced FE as the Plan's managed accounts provider.[15] Yet, AFA subcontracted FE to provide all advisory services.[16]

FE and AFA charge "asset-based fees" for Professional Management—*i.e.* they take a percentage of each member's assets. From 2011 to 2020, FE's and AFA's Professional Management asset-based fee-rates were as follows:

| FE/AFA's Asset-Based Fees for Home Depot Participants[17] (2011-2020) | | | | |
|---|---|---|---|---|
| | | Size of Participant Account (in assets) | | |
| **Date in Effect** | **Provider** | **$0-$100,000** | **$100,000-$250,000** | **$250,000+** |
| 2011 – Dec. 31, 2013 | FE | 0.60% | 0.45% | 0.30% |
| Jan. 2014 – Dec 31, 2016 | FE | 0.55% | 0.45% | 0.30% |
| Jan. 1, 2017 – Dec. 31, 2020 | AFA (with FE as "sub-advisor") | 0.50% | 0.45% | 0.30% |

Over 90% of Plan members had balances under $100,000 and paid the highest

---

[13] Doc. 270-1 at 44 (¶ 54).

[14] *See* Doc. 271-22 at 5-10, (43:17-44:11; 132:16-135:2).

[15] Doc. 265-2 at 97-98 (¶ 140).

[16] *Id.*

[17] Doc. 265-2 at 96-98 (¶¶ 139-140). These percentages are sometimes expressed as "basis points" (or "bps"). A basis point is 1/100th of a percent, so 0.60% is 60 bps.

fee-rate on all assets.[18]

### 1. *FE's and AFA's Fee-Rates Were Excessive*

The rates that FE and AFA charged to Plan participants were significantly higher than the industry norm. FE "operate[s] in a competitive industry," with companies such as Morningstar, GuidedChoice, and ProManage serving as "direct competitors."[19] Each of these providers charged less for managed accounts services than FE and AFA.[20] Morningstar offered fees as low as 0.20%; GuidedChoice offered fees as low as 0.25%; and ProManage typically charged 0.35% for the first $100 million in plan assets and 0.10% on the remainder.[21]

FE and AFA also charged comparable plans lower fee-rates for managed accounts.[22] Most comparably-sized plans paid lower asset-based fees and lower total fees than Home Depot.[23] Plans that negotiated lower fee-rates include Boeing (0.30%), Kaiser Permanente (0.35%), Motorola (0.35%), J.C. Penny (0.35%), Citigroup (0.40%), Deloitte (0.40%), Lucent Tech (0.45%), and Target (0.45% on

---

[18] Doc. 249-1 at 6.

[19] Doc. 283-2 at 4-5 (¶ 4).

[20] *See* Doc. 343 at 22 (finding this undisputed); Doc. 265-2 at 100-101, 108 (¶¶ 143-145, 153).

[21] Doc. 265-2 at 100-101 (¶¶ 143-145).

[22] Doc. 343 at 22 & n. 79

[23] Doc. 283-2 at 6-7 (¶ 8); Doc. 271-17; Doc. 271-14 at 28-29, 36-59 (¶ 45, App'x A); Doc. 271-12 at 28 (¶ 42).

the first $75,000 and 0.30% on the next $75,000).[24] In 2013, FE provided Defendants with pricing data for 18 comparably-sized plans; more than half had lower fee-rates than Home Depot.[25]

Home Depot's rates were so inflated, in part, because of a kickback scheme between FE and the Plan's Recordkeeper, Aon Hewitt ("Aon"). Between 2011 and 2017, FE remitted between 20-35% of its revenues (approximately $7.4 million) to Aon.[26] Yet, the Plan's consultant, Curcio Webb, concluded that Aon's fees should have been no more than $225,000 annually.[27] FE paid Aon, at least in part, for referring clients to FE—not a service that benefited participants.[28] In 2010, Aon relayed its willingness to credit these fees back to the Plan if Defendants retained FE.[29] But Defendants never requested this credit, and Aon only agreed to cap these fees at $1,500,000 in 2016 as part of the switch from FE to AFA.[30]

## 2. *Defendants Failed to Discuss or Evaluate FE and AFA's Fees*

Defendants failed to diligently monitor FE's and AFA's fees. Until this case was filed, neither Committee ever solicited competitive bids for managed accounts

---

[24] Doc. 251-18 at 96-97 (Ex. 6.1).

[25] Doc. 249-1 at 5-6.

[26] Doc. 265-2 at 148-150 (¶¶ 206, 208); Doc. 245-1.

[27] Doc. 265-2 at 173-174 (¶ 236).

[28] *Id*. at 152-153 (¶ 212).

[29] *Id*. at 154-155 (¶¶ 216-217).

[30] *Id*. at 164-165 (¶ 228).

providers, conducted a market survey of managed accounts fees, or considered alternative providers.[31] The Committees also never investigated the reasonableness of FE's fee arrangement with Aon.[32] In light of these and other deficiencies, the district court twice held (first in 2020 and again in 2022) that there were disputes of material fact as to whether Defendants prudently monitored FE and AFA's fees.[33]

## C. <u>The Challenged Funds Claims: Defendants Retained Imprudent Investments</u>

During the Class Period (April 12, 2012 – present), Defendants failed to timely remove imprudent investments from the Plan. The Plan's Investment Policy Statement ("IPS")—which governs the Plan's investment processes and objectives—indicated that each Plan investment should outperform its market benchmark and a "universe of similar funds" over three- and five-year timeframes.[34] Yet in quarterly reports to the IC, the Plan's investment consultant, Aon Hewitt Investment Consulting (AHIC), supplied performance data showing that each

---

[31] Doc. 289-3 at 97 (303:11-19), 66-68 (244:13-246:6); Doc. 250-1 at 34 (152:7-15), 32 (107:10-22).

[32] Doc. 251-15 at 7-8 (119:22-120:12); Doc. 289-3 at 48-49 (130:24-131:25); Docs. 245-17 – 245-24 (2012-2017 IC and AC meeting minutes).

[33] Doc. 343 at 52-53; Doc. 186 at 71-72.

[34] Doc. 245-7 at 4-5 (five-year period), 7 (three-year period); Doc. 245-8 at 4-5 (five-year period), 7 (three-year period); Doc. 265-2 at 19-20; 245-34 at 14-15 (AHIC quarterly report providing fund performance against 3- and 5-year "Investment Policy Objectives").

11

Challenged Fund vastly underperformed its objectives.[35]

### 1. *The BlackRock Funds*

The BlackRock Funds are a suite of target date funds ("TDFs"). TDFs are designed to achieve returns based on an investor's target retirement date.[36] Fund managers typically offer a "suite" of TDFs, with distinct funds for anticipated retirement dates, usually in five-year increments (e.g., a 2030 Fund, a 2035 Fund). TDFs invest in a mix of assets (including stocks, bonds, and cash) and adjust the allocation over time to reduce risk as the target date approaches.[37]

The BlackRock Funds underperformed numerous metrics, including market benchmarks like the S&P Target Date Indexes and S&P 500; TDF peer universes; and comparable TDFs.[38] Based on the Funds' poor performance, Plaintiffs' expert, Dr. Arthur Laffer, opined that a prudent fiduciary would have removed the BlackRock Funds by September 30, 2013—when most of the Funds were performing worse than 75% of peers, and some worse than 90%.[39] By that time,

---

[35] *See, e.g.*, Doc. 245-4 (BlackRock); Doc. 272-22 (Stephens); Doc. 272-29 (TS&W); Doc. 273-25 (JPM) (aggregating performance data from AHIC performance reports).

[36] Doc. 265-2 at 38 (¶ 60).

[37] *Id*. at 38-39 (¶¶ 60-61).

[38] *See* Docs. 245-3 – 245-5; Doc. 250-12 at 27-31 (Figures 1a-2b); Doc. 250-14 at 33-35 (Figures F-G).

[39] Doc. 250-12 at 27-29 (¶¶ 52-53); Doc. 250-14 at 28-29.

participants had invested over $620 million of their savings in the BlackRock Funds.[40]

But Defendants never removed the Funds due to a failed monitoring process. Instead of employing market benchmarks, the IC used BlackRock's "custom" benchmarks—which mirrored each Fund's investments and thus could not gauge performance relative to the market.[41] Throughout the Class Period, the IC never discussed the custom benchmarks' structure or design; never utilized BlackRock's designated "primary benchmark" (the S&P 500); and never considered other common TDF benchmarks (like the S&P TDF Indexes).[42] Nor did Defendants have a substantive discussion of alternative TDFs or even of BlackRock's other (better performing) TDF products.[43]

### 2. *The JPM Fund*

The JPM Fund combines "a fixed income portfolio" with insurance contracts meant to "stabilize the value and returns of the fund."[44] Plaintiffs' expert Dr. Laffer opined that a prudent fiduciary would have removed the Fund by September 30,

---

[40] Doc. 245-39 at 15.

[41] Doc. 250-12 at 18-19 (¶¶ 34-36); Doc. 265-2 at 56-61 (¶¶ 85-87, 89-92); Doc. 289-9 at 11 (89:2-12).

[42] Doc. 289-8 at 45-46 (233:10-234:17); Docs. 245-17 – 245-27 (2010-2020 IC meeting minutes, reflecting no such discussion); Doc. 265-2 at 49-50 (¶ 75).

[43] Doc. 265-2 at 88-90 (¶¶ 125-126).

[44] Doc. 245-7 at 7.

2012.[45] At that time, the Plan had over $500 million of participants' savings invested in the Fund, yet the Fund's three- and five-year returns had failed its benchmark for nine and five consecutive quarters, respectively.[46]

But the IC was not paying attention. According to meeting minutes, IC members only asked questions about the JPM Fund at *one meeting* during the entire Class Period.[47] The IC also changed the Fund's benchmark without discussion and never realized when AHIC reported the Fund's performance against the *wrong benchmark*.[48] The JPM Fund remains on the Plan.

### 3.  *The TS&W Fund*

The TS&W Fund invests "in U.S. small-capitalization companies that are believed to be undervalued relative to the market and industry peers."[49] Its primary objectives are to generate returns that exceed its benchmark and peer group median over three- and five-year periods.[50] By March 31, 2012—when participants had invested over $70 million of their savings—the Fund had underperformed its peer

---

[45] Doc. 250-12 at 25 (¶ 48).

[46] Doc. 245-35 at 6, 14; Doc. 283-2 at 59 (¶ 80); Doc. 273-25 (aggregating performance data).

[47] *See generally* Docs. 245-17 – 245-27 (2010-2020 IC meeting minutes); Doc. 245-22 at 4-5.

[48] *See* Doc. 250-12 at 24-26 (¶¶ 47, 49); Doc. 245-17 – 245-27 (2010-2020 IC meeting minutes, reflecting no discussion).

[49] Doc. 245-7 at 8.

[50] Doc. 273-10 at 11.

group median for nine consecutive quarters; its market benchmark and 99% of peers on a three-year basis; and 83% of peers on a five-year basis.[51] It also had a negative "information ratio," a common metric for risk adjusted returns.[52]

Plaintiffs' expert, Dr. Laffer, opined that a prudent fiduciary would have removed the Fund after the first quarter of 2012 (and certainly by June 30, 2012).[53] Yet, the Committee retained it until 2017.[54]

### 4. *Stephens Fund*

The objective of the Stephens Fund was to outperform its benchmark and the median of its peer group over three- and five-year periods.[55] By March 31, 2016-— when participants had invested over $74 million of their savings—the Fund had, for five straight quarters, underperformed 75% of its peers on a three-year basis; underperformed both its benchmark and peer group median on three- and five-year bases;[56] and had a negative information ratio over the previous five-year period.[57]

Plaintiffs' expert, Dr. Laffer, opined that a prudent fiduciary would have

---

[51] *See* Doc. 273-12 at 11, 14-15, 18, 48; 283-2 at 37 (¶ 50); 272-29 at 2.

[52] Doc. 273-12 at 48.

[53] Doc. 250-12 at 21-23 (¶¶ 43-44); Doc. 250-14 at 23-24.

[54] *See* Doc. 245-24 at 9.

[55] Doc. 245-7 at 5 (five years), 7 (three years), 9 (showing the Russell 2000 Growth Index as benchmark); Doc. 233-3 at 38 ("Performance Objective" was to "Outperform the Russell 2000 Growth by 2.5% p.a. over a market cycle.").

[56] Doc. 283-2 at 48-49 (¶ 67); Doc. 272-22 at 1.

[57] Doc. 283-2 at 48-49 (¶ 67); Doc. 250-12 at 23-24 (¶ 46).

removed the Stephens Fund from the Plan after the first quarter of 2016.[58] The IC, however, never considered an alternative small cap growth fund.[59] Nor did the IC discuss or inquire into the basis for AHIC's claims that the Stephens Fund was meant to "protect on the downside," and would "perform better" in the future.[60] As a result, Defendants did not remove the Fund until September 2017.

## II.    **Procedural Background**

Plaintiffs filed their complaint on April 12, 2018 and their Amended Complaint on July 11, 2018.[61] After defeating Defendants' motion to dismiss, Plaintiffs moved for class certification on December 20, 2019. On April 10, 2020, Defendants filed mid-discovery summary judgment motions on the Excessive Fees claims of several Plaintiffs. On September 21, 2020, Judge Ray granted Plaintiffs' motion for class certification and denied Defendants' summary judgment motions. Doc. 186. In denying summary judgment, Judge Ray found "genuine issues of material fact as to the elements of Plaintiffs' Excessive Fee claim." *Id*. at 71.

Following discovery, the parties cross-moved for summary judgment.[62] Plaintiffs sought partial summary judgment on the element of fiduciary breach for

---

[58] Doc. 250-12 at 23-24 (¶ 46); Doc. 250-14 at 20.

[59] Doc. 283-2 at 53-54 (¶ 74).

[60] *Id.* at 49-52 (¶¶ 69-71).

[61] Doc. 1; Doc. 53.

[62] Doc. 227; Doc. 240.

their Excessive Fees claim and their claim regarding the BlackRock Funds.[63] Defendants moved for summary judgment on all claims, making arguments as to the elements of breach and causation for each claim.[64] Defendants concurrently moved to exclude Plaintiffs' experts, Dr. Laffer and Dr. Gerald Buetow.[65] On December 21, 2021, the Chamber of Commerce of the United States of America filed an *amicus curiae* brief in support of Defendants.[66]

On February 24, 2022, Judge Ray held oral argument on the pending summary judgment and *Daubert* motions.[67] After hearing the parties' arguments, Judge Ray stated that he would deny Defendants' motion to exclude Dr. Laffer.[68] He reserved decision on all other motions.

On March 4, 2022, Judge Ray recused himself from the case after inheriting Home Depot stock.[69] The case was reassigned to Judge Steven D. Grimberg.[70] Plaintiffs filed a motion for recusal after learning of a previous affiliation between

---

[63] Doc. 240.

[64] Doc. 227; Doc. 228-1.

[65] Doc. 234; Doc. 236.

[66] Doc. 308; *see also* Doc. 312-1 (Plaintiffs' opposition).

[67] Doc. 332.

[68] *Id*. at 167:9-18; *see also* Doc. 320.

[69] Doc. 321.

[70] Doc. 322.

Judge Grimberg and Home Depot's *amicus curiae,* the Chamber of Commerce.[71]

On September 30, 2022, Judge Grimberg denied Plaintiffs' recusal motion, denied Plaintiffs' motion for partial summary judgment, granted Defendants' summary judgment motion, and denied Defendant's' *Daubert* motions as moot.[72]

In its summary judgment ruling, the court held that Plaintiffs had established disputes of material fact as to whether Defendants breached their duty of prudence by failing to appropriately monitor FE and AFA (the Excessive Fees claim) and the BlackRock Funds, the JPM Fund, and the TS&W Fund (i.e. all Challenged Funds except Stephens).[73] Nevertheless, the court granted Defendants' motion after holding that Plaintiffs had failed to establish disputes of material fact as to the element of causation. In its ruling, the court assumed Plaintiffs would bear the burden of proof on this element at trial.

The court further held that Plaintiffs had "waived" all claims for "equitable relief" by purportedly not raising such relief in summary judgment briefing.[74] The court also held that Plaintiffs had failed to establish breach as a matter of law

---

[71] Docs. 333–333-1.

[72] Doc. 343.

[73] *Id*. at 52-53 (Excessive Fees claim), 63-66 (BlackRock Funds), 80-83 (JPM Fund), 87-89 (TS&W Fund).

[74] *Id*. at 50.

concerning Defendants' monitoring of the Stephens Fund.[75]

## III.   <u>Standard of Review</u>

1.     This Court "review[s] *de novo* the grant of summary judgment." *Fowler v. OSP Prevention Grp., Inc.*, 38 F.4th 103, 109 (11th Cir. 2022).

2.     This Court "review[s] the allocation of the burden of proof de novo." *Preis v. Lexington Ins. Co.*, 279 F. App'x 940, 943 (11th Cir. 2008).

3.     The Court reviews "the district court's application of waiver for abuse of discretion," *Smith v. R.J. Reynolds Tobacco Co.*, 880 F.3d 1272, 1280 (11th Cir. 2018), but "underlying questions of law are reviewed de novo." *Hillcrest Prop., LLC v. Pasco Cnty.*, 754 F.3d 1279, 1281 (11th Cir. 2014); *see also Atlanta J. & Const. v. City of Atlanta Dep't of Aviation*, 442 F.3d 1283, 1287 (11th Cir. 2006) (same).

---

[75] *Id*. at 93-95.

## SUMMARY OF ARGUMENT

ERISA's fiduciary duties are "the highest known to law." *Herman*, 126 F.3d at 1361 (quotation omitted). Defendants must act with the "care, skill, prudence, and diligence" of "expert[s]" conducting an "enterprise of a like character and with like aims"—here, investing $9 billion of retirement savings.[76] 29 U.S.C. § 1109(a)(1)(B). Yet, Defendants fell well short of this tremendous responsibility. From the start of the Class Period, April 12, 2012, Defendants allowed FE and AFA to charge unreasonable fees and failed to remove the imprudent Challenged Funds.

In its Order, the district court correctly found disputes of material fact as to whether Defendants engaged in a prudent process for monitoring FE and AFA's fees, the BlackRock Funds, the JPM Fund, and the TS&W Fund. The court, however, erred in dismissing these claims on the ground that Plaintiffs failed to offer evidence of causation and had "waived" all equitable relief. As to the Stephens Fund, the court erroneously found no disputes of fact as to both breach and causation.

The court made four basic mistakes. It: (1) failed to hold Defendants to their burden on causation; (2) ignored Plaintiffs' arguments and evidence supporting equitable relief; (3) discounted or disregarded Plaintiffs' affirmative evidence of causation; and (4) in the case of Stephens, inappropriately weighed the evidence as

---

[76] *Sweda v. Univ. of Penn.*, 923 F.3d 320, 329 (3d Cir. 2019) ("expert[s]"); *see also Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) (trustees held to the "prudent investor rule"); *Katsaros v. Cody*, 744 F.2d 270, 275, 279 (2d Cir. 1984).

to Defendants' investment process.

## I.   The Court Failed To Hold Defendants To Their Burden On Causation

*First*, the court failed to hold Defendants to their burden on causation. In *Willett*, this Court held that, to prevail at summary judgment, Defendants must "establish the absence of causation" by "proving that the beneficiaries' claimed losses could not have resulted from" the fiduciary breaches. 953 F.2d at 1343. This ruling accords with the First, Second, Fourth, Fifth, and Eighth Circuits, all of which have held that, in ERISA fiduciary breach trials, the burden on causation shifts to the defendant-fiduciaries once plaintiff-participants establish breach and a related loss. Here, the court misunderstood *Willett* and therefore never held Defendants to their burden to "show *affirmatively*" that they prevail on causation. *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in State of Ala.*, 941 F.2d 1428, 1437–38 (11th Cir. 1991). Accordingly, summary judgment was improper. *Id.*

## II.   The Court Ignored Plaintiffs Arguments For Equitable Relief

*Second*, the court erred in holding that Plaintiffs "made no argument for equitable relief at summary judgment" and therefore had "waived" such claims. Under ERISA, non-monetary equitable remedies, like an injunction, are available if plaintiffs establish a breach of duty. *See Brock v. Robbins*, 830 F.2d 640, 647 (7th Cir. 1987). Here, Plaintiffs squarely sought injunctive relief, and Defendants' only argument against such relief was that they had not breached their duties. Plaintiffs

successfully defeated this argument for the Excessive Fees claim and on all but one of the Challenged Funds. Accordingly, the court should not have dismissed those claims for injunctive relief. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (non-movant need only rebut those arguments the movant raises).

Further, equitable doctrines apply to Plaintiffs' claims for monetary relief. The doctrine of surcharge holds fiduciaries liable for "loss[es] resulting from [their] breach of duty." *CIGNA Corp. v. Amara*, 563 U.S. 421, 441 (2011). ERISA tracks this standard. *See* 29 U.S.C § 1109. Thus, much of the parties' summary judgment briefing directly concerns surcharge. Plaintiffs did not "waive" it.

### III. <u>The Court Discounted or Disregarded Plaintiffs' Evidence of Causation</u>

*Third*, the district court failed to adhere to basic summary judgment principles, ignoring or otherwise inappropriately weighing Plaintiffs' evidence of causation.

As to the Excessive Fees claim, the court failed to account for "all evidence in the record." *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012). Specifically, the court held that plaintiffs had not identified comparable managed accounts providers to FE and AFA, even though Plaintiffs' expert, Dr. Gerald Buetow, identified such comparators in his testimony, and FE identified the same comparators in public filings.[77] Further, the court credited Defendants' argument that, on average, participants paid low fees as an absolute dollar value, and ignored

---

[77] *See* Doc. 271-12 at 9-15 (¶¶ 11-21); Doc. 265-2 at 100 (¶ 142).

ample evidence that prudent investors would instead evaluate (and reduce) FE and AFA's excessive *rates*. Finally, the court ignored evidence that FE remitted an excessive portion of participant fees to the Plan's recordkeeper.

For each of the Challenged Funds, the court likewise drew impermissible inferences against Plaintiffs and failed to consider "all evidence." *Strickland*, 692 F.3d at 1154. That evidence included the Funds' underperformance relative to several market benchmarks, peer universes, and comparable individual funds. It also included the testimony of Plaintiffs' expert, Dr. Laffer, that a prudent fiduciary would have removed the Funds. When the court considered this evidence at all, it improperly "weigh[ed] the competing evidence." *Strickland*, 692 F.3d at 1161.These are reversible errors. *See e.g., id.,* 692 F.3d at 1154; *Moore v. GEICO Gen. Ins. Co.*, 633 F. App'x 924, 930 (11th Cir. 2016) (reversing for discounting expert testimony).

The Court also erred by ignoring the circumstances "prevailing at the time" of each challenged decision and the "character and aim" of each Fund. *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 367 (4th Cir. 2014). For example, the court simply dismissed as insignificant the Funds' articulated three- and five-year performance goals. For the BlackRock and TS&W Funds, the court relied on hindsight, using data from *after* the time Dr. Laffer opined that a prudent fiduciary would have removed the Funds. These rulings are at odds with ERISA. *Id.*

**IV.**    <u>**The Court Weighed Evidence About Defendants' Process for Monitoring the Stephens Fund**</u>

*Fourth*, the court erroneously granted Defendants summary judgment on their process for monitoring the Stephens Fund. The basis for the court's ruling boils down to: (1) AHIC and Stephens made excuses for the Fund's underperformance at three meetings; and (2) Committee members asked a total of two questions about Stephens during the ten meetings that took place between October 2013 and March 31, 2016.[78] But the court disregarded evidence of the poor quality of the Committee's discussions, including the miniscule time allocated for discussing Fund performance and the Committee's failure to probe AHIC's and Stephens' excuses. Plaintiffs' evidence raises a genuine dispute as to whether the Committee "passively accept[ed] its consultant's positive appraisal…without conducting the independent investigation that ERISA requires." *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 436 (3d Cir. 1996).

---

[78] *See* Doc. 343 at 94-95 nn. 257, 259-261.

## ARGUMENT

### I.  ERISA's Standard of Care

ERISA's fiduciary duties are "the highest known to law." *Herman*, 126 F.3d at 1361 (11th Cir. 1997) (quotation omitted). The statute's duty of prudence requires Defendants to act with the "care, skill, prudence, and diligence," 29 U.S.C. § 1104(a)(1)(B), of "expert" investment managers. *Sweda*, 923 F.3d at 329.[79] Fiduciaries have a "continuing duty" to "monitor [plan] investments and remove imprudent ones." *Tibble v. Edison, Int'l*, 575 U.S. 523, 530 (2015).[80] They also must monitor service providers and ensure any fees are reasonable. *Tibble*, 843 F.3d at 1197-98.[81]

To prudently monitor, Defendants must "employ[] the appropriate methods to investigate and determine the merits of" their investment decisions. *In re Unisys*, 74 F.3d at 434. This requires "balanc[ing] the relevant factors and mak[ing] a reasoned decision," *George,* 641 F.3d at 796, after a "careful and perspicacious" analysis.

---

[79] *See also Tibble*, 843 F.3d at 1197 (trustees held to the "prudent investor rule"); *Katsaros*, 744 F.2d at 275, 279.

[80] *Accord Hughes v. Nw. Univ.*, 142 S. Ct. 737, 741-42 (2022); *see also Fink v. Nat'l Sav. & Tr. Co.*, 772 F.2d 951, 962 (D.C. Cir. 1985) (Scalia, J. concurring) (explaining that fiduciaries must have both sound processes *and* prudent investments).

[81] *See also George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 798–800 (7th Cir. 2011); *Pledger v. Reliance Tr. Co.*, 240 F. Supp. 3d 1314, 1330 (N.D. Ga. 2017).

25

*Gregg v. Transp. Workers of Am. Int'l*, 343 F.3d 833, 843 (6th Cir. 2003).[82] Failure to do so establishes breach and entitles Plaintiffs to injunctive relief "even if there is no monetary loss." *Brock*, 830 F.2d at 647.[83]

For monetary relief, the breach of duty must also cause a loss to the plan, 29 U.S.C. § 1109, involving the additional elements of loss and causation. The element of loss concerns a "comparison between the actual performance of the Plan" and the performance that "would have taken place" had the fiduciaries acted differently. *GIW Indus. v. Trevor, Stewart, Burton & Jacobsen*, 895 F.2d 729, 733 (11th Cir. 1990) (quotation omitted). In turn, the causation inquiry asks if the losses "result[ed] from" the breach. 29 U.S.C. § 1109. Causation hinges on whether a "hypothetical prudent fiduciary *would* have made the same decision[s] anyway" in light of the character and aims of the Plan. *Tatum*, 761 F.3d at 363-64.

## II. The District Court Erred by Holding That Plaintiffs Would Bear the Burden of Proof on the Element of Causation

In *Willett*, 953 F.2d at 1343, this Court held that defendant-fiduciaries bear the burden of proof on causation when moving for summary judgment. To prevail, Defendants must "establish the absence of causation by proving that the

---

[82] *See also* 29 C.F.R. § 2550.404a-1(b)(1)(i) (fiduciary must give "appropriate consideration to those facts and circumstances that... the fiduciary knows or should know are relevant to the particular investment").

[83] *See also Fink*, 772 F.2d at 962 (Scalia, J.) ("Breach of the fiduciary duty to investigate and evaluate would sustain an action to enjoin or remove the trustee.").

beneficiaries' claimed losses could not have resulted from" the fiduciary breaches. *Id.* The district court contorted this precedent and instead held that even on Defendants' motion, Plaintiffs would bear the burden on causation. Consequently, the court never required Defendants to "show *affirmatively*" the absence of causation—i.e. that a "hypothetical prudent fiduciary *would* have" approved FE/AFA's fees and retained the Challenged Funds. *Four Parcels*, 941 F.2d at 1437–38 (first quote); *Tatum*, 761 F.3d at 363 (second quote).[84] In so doing, it misapplied *Willett* and established trust law.

ERISA derives from trust law, and "courts often must look to the law of trusts" to interpret its provisions. *Tibble*, 575 U.S. at 528–29. Under trust law, once a participant establishes a breach and a related loss, the burden shifts to the defendant-fiduciaries to prove that the breach could not have caused the loss. Restatement (Third) of Trusts § 100 (2012) *cmt* f. The rationale is clear: fiduciaries have "superior (often unique) access to information about the trust and its activities," and burden-shifting "encourage[s] . . . compliance with applicable fiduciary duties." *Id.* So too in ERISA; hence, a majority of circuits that have addressed the issue have adopted trust law's burden-shifting framework. *Sacerdote v. New York Univ.*, 9 F.4th 95, 113 (2d Cir. 2021); *Brotherston v. Putnam Invs.*, LLC, 907 F.3d 17, 38 (1st Cir. 2018); *Tatum*, 761 F.3d at 363 (4th Cir.); *McDonald v. Provident Indem. Life Ins. Co.*, 60

---

[84] Doc. 343 at 43-45.

F.3d 234, 237 (5th Cir. 1995); *Martin*, 965 F.2d at 671 (8th Cir.)

While one circuit (the Tenth) has rejected burden shifting, in so doing it ignored the Supreme Court's repeated instructions to interpret ERISA in light of trust law.[85] *Compare Pioneer Centres Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1337 (10th Cir. 2017) (alluding to one Supreme Court case) *with Brotherston,* 907 F.3d at 36-38 (evaluating nine Supreme Court cases on the matter). The court also overemphasized the "default rule" allocating the burden to plaintiffs, 858 F.3d at 1335, without recognizing noted exceptions, including when facts are "peculiarly within the knowledge" of defendants, *Brotherston,* 907 F.3d at 35-36,[86] and when a contention is "disfavored." 2 McCormick On Evid. § 337 & n. 10 (8th ed.). Those exceptions resonate here. Fiduciaries are in a far better position to rebut causation than to "have the plaintiff hazard a guess as to what the fiduciary would have done." 907 F.3d at 38. Further, causation is a "disfavored" defense to breach of the law's highest duties: "Courts do not take kindly" to fiduciaries who argue that, absent their breach, "everything would

---

[85] The Ninth, Sixth, and Seventh Circuits have stated that plaintiffs must plead or show causation—but not in cases where burden-shifting was before the court. *See Saumer v. Cliffs Natural Resources Inc.*, 853 F.3d 855, 863 (6th Cir. 2017); *Peabody v. Davis*, 636 F.3d 368, 373 (7th Cir. 2011); *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1099 (9th Cir. 2004); *Kuper v. Iovenko*, 66 F.3d 1447, 1460 (6th Cir. 1995). *See Tatum*, 761 F.3d at 362 n. 10. (noting *Kuper* did not involve "a situation in which plaintiffs had already established both fiduciary breach and a loss.").

[86] (quoting *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 60 (2005)).

have been the same." *Martin*, 965 F.2d at 672 (citation omitted).

*Willett* squares directly with this burden-shifting framework. Ordinarily, the movant prevails at summary judgment if it shows that the non-movant cannot present evidence on an element "on which [he/she] will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). But with burden shifting, the movant may bear the burden of proof at trial. Therefore, at summary judgment, it must "show *affirmatively*" that a jury *must* rule in its favor. *Four Parcels*, 941 F.2d at 1437–38.

This is exactly what the Court held in *Willett*. On defendants' motion, they must "establish the absence of causation" by "*proving* that the [plaintiffs'] claimed losses could not have resulted from" the breach. 953 F.2d at 1343 (emphasis added).[87] Likewise, on plaintiffs' motion, they have the "burden of proof on the issue of causation." *Id.* Both parties bear the burden of proof on causation on their respective motions because, until there are findings as to breach and loss, the court does not know which party will have the burden on causation at trial. *See Tatum*, 761 F.3d at 362 n.10 (noting that in *Willett* the questions of breach and loss were still undecided).

The district court misunderstood *Willett* and therefore applied the wrong

---

[87] *See also Tatum*, 761 F.3d at 362 n. 10 (noting that *Willett*'s language supports burden shifting on causation).

summary judgment standard to the element of causation. It erroneously granted Defendants' motion without ever finding that they had met their initial burden to "show affirmatively," with their own evidence, the "absence of causation"—i.e. that a "hypothetical prudent fiduciary would" have approved FE/AFA's fees and retained the Challenged Funds. *Four Parcels*, 941 F.2d at 1438 (first quote); *Willett*, 953 F.2d at 1343 (second quote); *Tatum*, 761 F.3d at 363 (third quote).[88] Accordingly, this Court should, at the least, remand this case so that the district court can evaluate the evidence under the appropriate standard.

### III.    <u>Plaintiffs Never "Waived" Claims for Equitable Relief</u>

In a short passage, the district court held that Plaintiffs had waived all available equitable relief under ERISA, including "injunction, mandamus, restitution, and surcharge."[89] This was error. Plaintiffs pled entitlement to equitable relief in their complaint, and at summary judgment, presented arguments and evidence on the central elements of such relief. The court's ruling on "waiver" reflects fundamental misunderstandings about the nature of available equitable relief under ERISA and about Plaintiffs' burden in opposing summary judgment.

"An ERISA fiduciary's duty is derived from the common law of trusts," *Tibble*, 575 U.S. at 528 (citation omitted), and equity is embedded in ERISA's

---

[88] *See* Doc. 343 at 43-45, 53-61, 78-80, 84-87, 90-93, 95-96.

[89] Doc. 343 at 50.

remedial provisions, including those at issue here, 29 U.S.C. §§ 1132(a)(2), 1109, & 1132(a)(3). *See Donovan v. Mazzola*, 716 F.2d 1226, 1235 (9th Cir. 1983) (discussing § 1109 in light of trust law); *Amara*, 563 U.S. at 440-42 (same for § 1132(a)(3)). These provisions provide for "a host of" equitable relief, including monetary remedies (like surcharge) and non-monetary remedies (like injunction). *Amara*, 563 U.S. 421, 440-42.

Here, Plaintiffs explicitly sought surcharge,[90] an equitable remedy providing "monetary 'compensation' for a loss resulting from a trustee's breach of duty." *Amara*, 563 U.S. at 441. ERISA tracks this remedy. 29 U.S.C. § 1109 (fiduciaries must "make good" all losses "resulting from" their breaches); § 1132(a)(2) (authorizing suits under § 1109). Thus, Plaintiffs did not "waive" their surcharge remedy.[91] All their briefing, including on breach and causation, bears directly upon the elements of surcharge.[92]

The same can be said for injunctive relief. Under ERISA, injunctive relief is appropriate if a plaintiff "can prove to a court that certain trustees have acted imprudently, even if there is no [resulting] monetary loss." *Brock*, 830 F.2d at 647 (citing 29 U.S.C. § 1109(a)).[93] Plaintiffs explicitly argued that Defendants failed to

---

[90] Doc. 53 at 107 (¶ ix).

[91] Doc. 343 at 50.

[92] Doc. 270 (*passim*).

[93] *Accord Fink*, 772 F.2d at 962 (Scalia, J.) ("Breach of the fiduciary duty to

prudently monitor FE's and AFA's fees and the Challenged Funds' performance.[94] Plaintiffs also argued that, even if they could not establish loss or causation, a finding of breach alone would support injunctive relief.[95] The only argument that Defendants offered against an injunction was that they had not breached their duties. The court rejected that argument for all claims except the Stephens Fund.

Thus, the court erred by granting summary judgment on Plaintiffs' claims for injunctive relief as to the Excessive Fees claim, the BlackRock Funds, the JPM Fund, and the TS&W Fund. Rather than "waive" their entitlement to injunctive relief, Plaintiffs prevailed on Defendants' only argument against such relief. *See Clark*, 929 F.2d at 608 (non-movant need only rebut those arguments the movant raises). Accordingly, even putting aside Plaintiffs' evidence of loss and causation, Plaintiffs are entitled to a trial on these claims for injunctive relief.

## IV.  Plaintiffs Established Material Disputes of Fact as to Causation

ERISA's causation element—at times dubbed "substantive" or "objective" prudence—hinges on whether a "hypothetical prudent fiduciary would have made the same [investment] decision anyway." *Tatum*, 761 F.3d at 363. This element "cannot be analyzed in the abstract." *GIW Indus.* 895 F.2d at 732. Instead, "a court

---

investigate and evaluate would sustain an action to enjoin or remove the trustee.").

[94] Doc. 270 at 15-18, 23-29, 31-32, 35-39.

[95] *Id.* at 9-10.

must consider the 'character and aim of the particular plan and decision at issue and the circumstances prevailing at the time.'" *Tatum*, 761 F.3d at 367 (citation omitted); *see also GIW Indus.,* 895 F.2d at 732 (rejecting fiduciaries' argument that investment in long-term government bonds was prudent given the fund's need for immediate liquidity).

Here, the court failed to consider "all relevant evidence" and the "totality of the circumstances" concerning causation. *Tatum*, 761 F.3d at 368. Even assuming *arguendo* that Plaintiffs have the burden on causation, *but see* Section II, *supra*, Plaintiffs raised triable issues of fact as to this element. The court reached its contrary conclusion by either ignoring Plaintiffs' evidence or weighing the parties' evidence and drawing inferences in favor of Defendants. "In either case, the court erred." *Moore*, 633 F. App'x at 930; *see Strickland*, 692 F.3d at 1161 (weighing evidence inappropriate at summary judgment).

## V.   Plaintiffs Presented Ample Evidence that the Plan Paid Excessive Fees to FE and AFA for Managed Accounts Services

Defendants do not dispute that FE and AFA charged Plan participants (1) higher fee rates than other managed accounts providers and (2) higher rates and higher total fees than participants in most other similarly-sized plans.[96] Nor do Defendants dispute that Home Depot allowed FE to pay the Plan's Recordkeeper,

---

[96] Doc. 343 at 22; Doc. 283-2 at 6-7 (¶ 8).

Aon, 20%-35% of the fees it collected from the Plan, despite the Plan consultant's warnings that such payments may be "unreasonably high."[97] Based on this evidence, the district court (Ray, J.) concluded that there was a genuine dispute of material fact as to the reasonableness of FE/AFA's fees and denied Defendants' original summary judgment motions.[98] Yet, the district court (Grimberg, J.) later reversed course. It got there only by ignoring expert testimony and inappropriately weighing evidence against Plaintiffs.

## A. Alternative Providers Offered Comparable Services for Lower Fees

Despite finding that other managed accounts providers charge lower fees than FE and AFA,[99] the court held that these other providers were not "apples-to-apples" comparators and that Plaintiffs presented "no evidence" that they "satisfied the Plan's goals as well as or better than FE and AFA."[100] These improper findings of fact directly conflict with the opinion of Plaintiffs' expert and with the public filings of FE and its competitors, all of which support the court's (Ray, J.) original observation: that record evidence shows Plaintiffs' comparators offered

---

[97] Doc. 265-2 at 148-149 (¶ 206), at 160 (¶ 224).

[98] Doc. 186 at 71-73.

[99] Doc. 343 at 22.

[100] *Id.* at 58.

"comparable investment advisory services."[101]

First, Plaintiffs' expert, Dr. Buetow, explained that GuidedChoice, ProManage, and Morningstar all offer "very similar services based on the same investment construct" as FE and AFA—they each map a plan's investment options onto "a series of discrete optimal asset allocations … and then place each participant in one of the solutions."[102] While the court cited Dr. Buetow's report, it disregarded his analysis and conclusions.[103] This alone requires reversal. *See, e.g., Moore*, 633 F. App'x at 930.[104]

Public filings confirm Dr. Buetow's conclusions. FE admitted on multiple occasions that GuidedChoice, Morningstar, and ProManage are "direct competitors," and acknowledged that even "indirect competit[ors]," like target date funds, are viable "substitutes" for its services.[105] Disclosures by GuidedChoice, Morningstar, and ProManage show that, like FE, they each offered a managed accounts program that allocates a participant's investment portfolio among the

---

[101] Doc. 186 at 72.

[102] Doc. 271-12 at 11 (¶ 14); s*ee also id.* at 9-14 (¶¶ 11-20) (reviewing each provider); Doc. 250-13 at 24-25 (¶ 58) (ProManage).

[103] Doc. 343 at 58 n.176.

[104] Dr. Buetow also evaluated FE and AFA's services against TDFs, and found that the purported "customization" offered by FE and AFA did not justify the price premium they charged over TDFs. Doc. 271-12 at 16-27 (¶¶ 24–40). This also supports the inference that FE/AFA's fees were unreasonably high.

[105] Doc. 145-15 at 17; Doc. 271-11 at 42-43.

plan's investment options based on individual participant data.[106] Each served plans with billions of dollars in assets and hundreds of thousands of participants.[107] And each could have integrated with the Plan's recordkeeper.[108] Defendants did not point to any evidence that establishes a material difference between the services provided by FE/AFA and the services provided by these comparators.[109] Indeed, Defendants did not address Morningstar's services *at all*.[110]

---

[106] Doc. 247-9 at 5-7, 10 (GuidedChoice manages accounts based on individual's account balance, savings rates, retirement age, expected benefits (i.e., social security), outside assets, and preferences); Doc. 145-12 at 6 (ProManage manages accounts based on individual's retirement age, retirement income, savings rate, investment risk tolerance, and other retirement assets and benefits); Doc. 242-27 at 3 (Morningstar "personalize[s]" accounts based on "the specific circumstances of the individual," including investments in company stock and outside retirement investments).

[107] *See* Doc. 271-12 at 13 (¶ 19) (ProManage); Doc. 242-27 at 3 (Morningstar managed over $186 billion in assets); Doc. 247-11 at 11 (McDonald's Plan used GuidedChoice's managed accounts program); Doc. 279-3 at 22 (McDonald's Plan assets over $3 billion).

[108] *See* Doc. 270-1 at 137, 142 (¶¶ 163, 168); Doc. 289-31 at 25-26 (190:22-191:3) (Home Depot Director of Benefits testified that Aon supported connection with GuidedChoice and Morningstar as early as 2011); Doc. 246-17 at 138, 141 (Aon stated in 2010 that it had a "flexible architecture for integrating with any managed accounts provider" and partnered with multiple providers including GuidedChoice); Doc. 271-28 at 5 (40:23-41:25) (Recordkeeper testified that it could work with managed accounts providers other than FE); Doc. 290-10 at 213 (213:8-19) (Defendant's expert admitted the Plan could have switched providers without changing recordkeepers); Doc. 271-12 at 11-13 (¶¶ 15-16) (noting *inter alia* that McDonald's 401(k) plan used GuidedChoice with Aon as recordkeeper).

[109] Doc. 270-1 at 137-140, 142-144 (¶¶ 163-64, 168).

[110] *See id.* at 127-145 (¶¶ 155-69).

36

A reasonable factfinder could therefore readily conclude that these comparators would have satisfied the Plan's goals as well as or better than FE and AFA. The Plan had two goals for its managed accounts provider, to help participants: (1) manage their portfolios with a solution that could "integrate" with the Plan's recordkeeper; and (2) grow their accounts.[111] As to the first goal, as explained above, each comparator managed participant portfolios for large employer plans and could integrate with the Plan's recordkeeper. As to the second goal, FE and AFA failed to grow participant accounts. In every quarter of every year from 2012 to 2019, participants who enrolled in FE's and AFA's program had consistently *lower* expected growth and returns net-of-fees than those who did not.[112] Indeed, the portfolios of participants using FE/AFA underperformed those of non-enrolled participants throughout the Class Period even on a risk-adjusted basis.[113]

Contrary to the district court's holding, therefore, there is ample evidence of a genuine dispute as to whether alternative providers were appropriate comparators that could have similarly served the plan's goals. In ruling otherwise, the court failed to account for "all evidence in the record" and "draw reasonable factual inferences in favor of the nonmoving party." *Strickland*, 692 F.3d at 1154.

---

[111] *Id*. at 58 (¶ 69); Doc. 265-2 at 189 (¶ 255).

[112] Doc. 265-2 at 193-94 (¶¶ 261-62); Doc. 245-2 at 2-3.

[113] Doc. 283-2 at 16 (¶ 25).

### B. **FE and AFA Charged Lower Rates to Most Similar Plans**

It is also undisputed that Home Depot paid FE and AFA higher fee-rates *and* higher total fees than most comparably-sized plans.[114] This, too, shows that Defendants failed to negotiate reasonable fees. Yet, the district court found this evidence immaterial. In so doing, it committed two sets of errors.

First, the court claimed that the Plan's high fee-rates were reasonable because the average Plan participant had less money in her account, and therefore paid a lower dollar amount, than average participants in other plans.[115] But FE and AFA do not charge flat dollar amounts; they charge fee-*rates*, i.e. a percentage of each participant's asset. Indeed, overwhelming evidence shows that market participants—including FE, AFA, and the Plan's consultants—explicitly quote, evaluate, and negotiate managed accounts fees in *rates*.[116] Thus, prudent fiduciaries focus on reducing those rates.[117] After all, when each participant pays a lower share of her assets, the Plan as a whole has lower expenses. *See* 29 U.S.C. § 1109 (imposing liability for losses "to the plan").[118]

In finding that the Plan's low average account balance justified its higher fee

---

[114] Doc. 283-2 at 6-7 (¶ 8); Doc. 271-17 at 2.

[115] Doc. 343 at 54-56.

[116] *See* Doc. 283-2 at 9-12 (¶¶ 13–17) (citing no evidence to dispute this contention).

[117] Doc. 271-12 at 28-31.

[118] *Cf.* Doc. 271-12 at 29 (¶ 45).

rates, the court ignored expert testimony to the contrary.[119] As Plaintiffs' expert, Dr. Buetow, made clear, since managed accounts providers are "automated, providers do not incur significant costs to serve more participants" or "small accounts."[120] FE likewise admits that its "scalab[le]" technology allows it to add "participants with less than pro rata incremental expenses."[121] Thus, Plaintiffs' expert testified, a plan's "total assets" is the "only criteria used to develop fee schedules."[122] Dr. Buetow's regression analysis confirms this; average account balances had no significant impact on the total fees plans paid for FE's or AFA's services.[123]

Second, the court improperly found that Home Depot's rates were reasonable because they were in line with "other Plans under FE's and AFA's management."[124] This ignores that most of those plans have significantly fewer assets, and therefore

---

[119] Doc. 271-12 at 29 (¶ 44); Doc. 271-14 at 14-15 (¶¶ 23-24).

[120] Doc. 271-12 at 29 (¶ 44); Doc. 271-14 at 14 (¶ 23).

[121] Doc. 145-24 at 15.

[122] Doc. 271-14 at 14 (¶ 24).

[123] Doc. 283-2 at 12 (¶ 19); Doc. 271-14 at 20. Though the district court did not exclude Dr. Buetow's regression analysis, it discounted it because he used "Total Fees" as a dependent variable. Doc. 343 at 56 n. 170. This was error. Not only were managed accounts fees the chief component of "Total Fees" (upwards of 80% by Defendants' admission), *see* Doc. 261 at 25-27, but Dr. Buetow also testified that, even after subtracting the Online Advice fee, the Plan frequently paid more in managed accounts fees alone than his regression predicts it should have paid in *total fees*. Doc. 261-9 at 5 (¶ 10). Dr. Buetow's graphical analysis confirmed the implications of his regression: the Plan paid excessive fees. Doc. 271-14 at 27-34 (¶¶ 43-48) & App'x A.

[124] Doc. 343 at 56.

less bargaining power, than Home Depot.[125] Most plans with similar plan assets (and thus similar bargaining power) paid lower fees.[126] Indeed, even assuming that average account balances mattered, the only plans comparable to Home Depot's in size *and* average account balances paid far less than Home Depot.[127]

At each turn, the district court failed to account for Plaintiffs' expert testimony and other evidence, or implicitly weighed and disregarded it. Either way, the court erred. *See Shaw v. Conn. Gen. Life Ins. Co.*, 353 F.3d 1276, 1286 (11th Cir. 2003) (reversing district court ruling that resolved disputes among medical experts at summary judgment); *Strickland*, 692 F.3d at 1161; *Moore*, 633 F. App'x at 930.

### C. <u>**FE Payments to Aon were Excessive**</u>

The court also failed to consider evidence that FE passed the cost of its kickback payments onto participants through inflated managed accounts fees. Ample evidence shows that the money FE remitted to Aon (20-35% of FE's collected fees) was disproportionate to any services provided.

*First*, contrary to Defendants' arguments, FE did not pay Aon for "data

---

[125] *See* Doc. 271-14 at 13-15 (¶¶ 22, 24); Doc. 271-12 at 28-29 (¶¶ 42, 43 n. 40); Doc. 289-3 at 61-63 (218:10-220:16); Doc. 283-2 at 6 (¶ 8) (undisputed that most comparably sized plans paid less than Home Depot's).

[126] Doc. 271-14 at 27-34 (¶¶ 43-48) & App'x A.

[127] Doc. 265-2 at 108-110 (¶¶ 153-154); Doc. 251-18 at 96-99 (J.C. Penney paid AFA 0.35%); Doc. 271-12 at 31 n. 42 (Target and Kaiser Permanente paid lower rates than the Plan).

40

connectivity," but instead, at least in part, for Aon's commitment to exclusively refer its clients to FE—which benefitted FE, not the Plan.[128]

*Second*, Aon offered to credit its fees from FE back to the Plan, but Defendants never even attempted to negotiate such a credit.[129] Another plan, the Boeing 401(k) plan, successfully negotiated a credit for the fees FE remitted to that plan's recordkeeper.[130]

*Third*, Defendants' consultant, Curcio Webb, testified that Aon should charge no more than $225,000 per year for connectivity and warned that the payments to Aon could be "unreasonably high."[131]

*Fourth*, Home Depot's own Director of Benefits admitted that Aon's fees from FE rendered "the revenues generated by the current managed accounts fee structure . . . by definition greater than the value of the services provided."[132]

While the district court improperly dismissed on procedural grounds a claim based on the Plan's failure to recoup Aon's offer of reimbursement (the second piece

---

[128] *See* Doc. 265-2 at 152-53 (¶ 212-213); *see also* Doc. 289-1 at 116-117 (¶ 111); Doc. 230-3 at 27-28.

[129] *See* Doc. 265-2 at 154, 157-58 (¶¶ 216, 220-21).

[130] *Id.* at 175-76 (¶ 237).

[131] *Id.* at 160 (¶ 224); Doc. 289-5 at 4-6 (54:6-56:17).

[132] Doc. 265-2 at 166-67 (¶¶ 230-31); Doc. 289-1 at 84 (¶ 81); Doc. 249-6 at 3.

of evidence above),[133] it ignored the above evidence in its ruling on causation.[134] It therefore failed to account for "all evidence in the record" concerning causation. *Strickland*, 692 F.3d at 1154.

## VI. Plaintiffs Established Disputes as to Causation on the Challenged Funds Claims

### A. The BlackRock Funds

According to the IC, the purpose of the BlackRock Target Date Funds was to "maximize assets for retirement."[135] Plaintiffs marshalled substantial evidence, including expert testimony, that the Funds were not meeting this goal, rendering them substantively imprudent as early as September 30, 2013. The district court reached a contrary conclusion by ignoring most of Plaintiffs' evidence, weighing evidence, and applying the wrong legal standard for substantive prudence.

### 1. *Plaintiffs' Evidence of Underperformance*

Plaintiffs identified several metrics which raise a triable issue as to the substantive prudence of the BlackRock Funds.

*First*, the BlackRock Funds substantially underperformed the median target date fund—a benchmark that Dr. Laffer[136] and the IC endorsed.[137] As of September

---

[133] Doc. 343 at 45-47.

[134] *Id.* at 53-61.

[135] Doc. 289-8 at 28 (190:5-190:13).

[136] Doc. 250-12 at 26-31; Doc. 250-14 at 28-31.

[137] *E.g.* Doc. 245-7 at 4 (funds must have returns "competitive" with the "appropriate

30, 2013 (Q3 2013), most of the Funds had performed worse than 75% of peers on a three-year basis—with two of the funds performing worse than 80% and one (the 2035 Fund) performing worse than 94%.[138] The underperformance continued thereafter.[139]

*Second*, by Q3 2013, the Funds underperformed the S&P Target Date Index Series—"the most widely-used target maturity index for measuring TDF performance"—on both a three-year and five-year basis.[140]

*Third,* the Funds suffered sustained underperformance relative to the S&P 500[141]—which Home Depot identified as the Funds' "appropriate benchmark" in mandatory disclosures,[142] and which BlackRock and Morningstar identified as the Funds' "primary benchmark."[143]

*Fourth*, the Funds underperformed comparator TDFs, which Dr. Laffer explained is yet another way to evaluate returns.[144] As of September 30, 2013, every

---

universe of similar funds."); Doc. 279-2 at 7-8 (peer ranking in parentheses).

[138] Doc. 279-2 at 7-8; *see also* Doc. 265-2 at 67-69, 70-72 (¶¶ 100, 104-105).

[139] Doc. 245-4.

[140] Doc. 250-14 at 32-34.

[141] Doc. 245-3 at 2 (underperformance compared to S&P 500 Index).

[142] Doc. 245-9 at 4; Doc. 289-8 at 41-42 (214:18-215:19) (The Committee agreed that the "S&P 500 Index would give Plan Participants an adequate understanding of how well the BlackRock Funds were performing").

[143] *E.g.* Doc. 248-5 at 2-3, Doc. 248-1 at 2; Doc. 289-25.

[144] Doc. 250-14 at 34.

43

BlackRock Fund underperformed relative to the most popular TDF on the market, Vanguard, on both a three-year and five-year basis.[145] BlackRock also underperformed Vanguard and T. Rowe Price on an annualized basis in 2012 and 2013.[146] By 2013, the Funds underperformed even their own mutual fund counterparts.[147]

*Fifth*, according to filings with the Department of Labor, BlackRock's TDF series lost more than half of its clients from 2012 to 2015, going from 155 clients in 2012 to 70 clients in 2015.[148] The market responded to the Funds' weak performance, but Defendants did not.

*Sixth*, in light of the evidence of significant underperformance, Plaintiffs' expert Dr. Laffer opined that as of September 30, 2013 (and certainly by December 31, 2013), a prudent fiduciary would have removed the BlackRock Funds.[149]

## 2. *The District Court Ignored and Weighed Plaintiffs' Evidence*

The district court ignored most of Plaintiffs' evidence in its ruling on substantive prudence. It addressed only the Funds' performance compared to their

---

[145] Doc. 250-14 at 34-35; *see* Doc. 289-12 (showing Vanguard most popular). AHIC also used Vanguard as a comparator fund. Doc. 245-31 at 15; Doc. 272-11 at 27-33.

[146] Doc. 289-26 at 2.

[147] Doc. 245-2 at 2.

[148] Doc. 279-7 at 2 (excerpted from full exhibit on district court docket).

[149] Doc. 250-12 at 27-31; Doc. 250-14 at 28-29.

peer universes—just one of the six sources of evidence Plaintiffs cite above. By failing to consider "all of the evidence," the court erred. *Strickland*, 692 F.3d at 1154. This error was particularly egregious as to Dr. Laffer's expert testimony, which the court was not free to ignore. *See Moore*, 633 F. App'x at 930; *Tatum*, 761 F.3d at 368 n. 17 (district court abused its discretion by failing to consider testimony of plaintiffs' investment expert at trial).

Further, the court inappropriately weighed evidence concerning the BlackRock Funds' performance compared to their peer medians.[150] The court reasoned that the peer universes consist of "TDFs with different glide paths," making the peer median an "apples and oranges" comparison.[151] But the evidence indicated otherwise. The Plan's investment consultant (AHIC), the Investment Committee, and Plaintiffs' expert all used and endorsed the very peer universes at issue.[152] Indeed, contrary to the district court's conclusions, Dr. Laffer explained that prudent fiduciaries compare TDFs with different glidepaths because they all have the same goal: "to maximize Plan participants' assets at retirement."[153] The court erred by

---

[150] Doc. 343 at 79-80.

[151] *Id.* at 79.

[152] *E.g.* Doc. 279-2 at 7-8 (AHIC report); Doc. 265-2 at 43-44 (¶ 69) (admitting IC relied on AHIC); Doc. 250-12 at 28-31 (Laffer citing AHIC data); Doc. 250-14 at 26-27 (same).

[153] Doc. 250-14 at 30-31.

disregarding this evidence. *Strickland*, 692 F.3d at 1154; *Moore*, 633 F. App'x at 930.

The district court also claimed that "the fact that other funds posted higher returns on a three, five, or ten-year basis does not establish that they are superior vis-à-vis the Plan's goals."[154] This pat assertion failed to account for the IC's stated goal: to maximize assets for retirement.[155] As Dr. Laffer explained, relative performance is how investors determine whether a fund attains this goal.[156] "Any reasonably sophisticated investor" would recognize that "the decision to pick one investment over another might result in a measurable loss of opportunity." *Brotherston,* 907 F.3d at 31.

Moreover, the evidence did not simply show that "other funds posted higher returns."[157] It showed that *seventy*, *eighty*, and even *ninety* percent of other funds did so on three- and five-year bases.[158] The district court brushed aside the severity of BlackRock's underperformance and improperly viewed this evidence in the light most favorable to Defendants. *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986).

---

[154] Doc. 343 at 79.

[155] Doc. 289-8 at 28 (190:5-190:13).

[156] Doc. 250-14 at 29-31.

[157] Doc. 343 at 79.

[158] Doc. 279-2 at 7-8; Doc. 250-12 at 29; Doc. 250-14 at 28-29; Doc. 245-4.

### 3. *The Court Applied the Wrong Standard*

The district court also applied the wrong legal standard to its causation analysis. It stated:

> Plaintiffs lack of material evidence that no prudent fiduciary would have concluded that the BlackRock TDFs' performance *would improve in the future* (especially considering BlackRock's changes to its glide path in 2014) . . . is ultimately fatal to Plaintiffs' claims.[159]

Substantive prudence is not, as the court held, solely dependent on speculation about whether a fund's performance "would improve."[160] Rather, it is a "totality-of-the-circumstances inquiry," *Tatum*, 761 F.3d at 368, in which a fund's history of poor performance plays the most prominent role. *See Hughes*, 142 S. Ct. at 742 ("If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty.").

Moreover, substantive prudence must be judged "by the circumstances prevailing at the time" of the challenged decision. *Tatum*, 761 F.3d at 367. Here, Dr. Laffer testified that a prudent fiduciary would have removed the Funds by September 30, 2013 (and certainly by December 31, 2013). The district court dispensed with this standard and instead relied on "changes to [BlackRock's] glide path in 2014,"[161]

---

[159] Doc. 343 at 80 (emphasis added).

[160] *Id.*

[161] Doc. 343 at 80.

and Defendants' assertion that the Funds "are *presently* [i.e. in 2021] popular,"[162] even though BlackRock was losing clients in 2013.[163] Accordingly, the district court applied an inappropriate standard—one biased by impermissible hindsight—to its analysis of the Funds.

### B. __The JPM Fund__

Plaintiffs set forth significant evidence that the JPM Fund was substantively imprudent as early as September 30, 2012. In finding no dispute of material fact on causation, the court ignored evidence about the Fund's goals and performance.

First, the district court ignored evidence about the Fund's goals. It opined that the Fund sought only "modest returns," and so long as it "never lost money," it met its objectives.[164] But the Plan had other goals for JPM: it had a benchmark and peer group to outperform.[165] When JPM failed its objectives, the Plan's investment consultant issued a warning (in red ink).[166] As Dr. Laffer explained, "when the JPM failed to outperform its benchmark and the median peer on both a three- and five-

---

[162] *Id.* at 78 (emphasis added); *see also id.* at 80.

[163] Doc. 279-7 at 2 (excerpted from full exhibit on district court docket).

[164] Doc. 343 at 84-85.

[165] *See* Doc. 271-38 at 5 (IPS requiring performance relative to peer universe and benchmark; identifying "five-year time span" for performance); *id.* at 8 (identifying benchmark, and expecting JPM to outperform over a market cycle of "three or more years"); Doc. 271-39 at 5, 7 (same for Nov. 2012 IPS).

[166] *See e.g.* Doc. 272-28 at 14-15.

year basis... it would have been clear to any retirement plan fiduciary that the JPM Fund was not delivering on stated objectives."[167]

Yet the district court viewed the Fund's underperformance in the light least favorable to Plaintiffs. It held that "Plaintiffs marshal no material evidence... that no prudent fiduciary would have retained the [JPM] Fund based on AHIC's proffered benchmarks."[168] But that is exactly what Plaintiffs' expert opined: a prudent fiduciary would have removed the Fund by September 30, 2012 (Q3 2012), when its three-year and five-year returns had failed its benchmark for ten and six consecutive quarters, respectively.[169] Further, the evidence of continued three- and five-year underperformance throughout 2013 was undisputed.[170] Thus, the court could have only reached its conclusion by ignoring Plaintiffs' evidence or viewing the evidence in the light most favorable to Defendants. Either way, the court erred. *Tippens*, 805 F.2d at 953.

Moreover, the court improperly credited the opinion of Defendants' expert, Dr. Wermers, over Plaintiffs' evidence.[171] Here, the court accepted Dr. Wermers'

---

[167] Doc. 250-14 at 40; *see also* Doc. 250-12 at 25; Doc. 245-35 at 6 (showing JPM underperformed benchmark and peer median on three- and five-year bases).

[168] Doc. 343 at 86.

[169] Doc. 273-25 at 2; Doc. 250-12 at 25; Doc. 250-14 at 40; Doc. 245-35 at 6.

[170] Doc. 283-2 at 59 (¶ 81); Doc. 273-25.

[171] Doc. 343 at 85.

evidence of the Fund's ten-year returns, even though the IPS,[172] AHIC, [173]  and Dr. Laffer[174] all recognized the Fund's goals were pegged to three- and five-year returns—goals the Fund consistently failed through 2013.[175] The court should not have weighed this competing evidence at summary judgment. *See Shaw*, 353 F.3d at 1286 (reversing district court ruling that resolved disputes among experts at summary judgment); *Strickland*, 692 F.3d at 1161; *Tatum*, 761 F.3d at 367 (must consider "character and aim" of the investment).

The one case the court cited, *Ellis v. Fid. Mgmt. Tr. Co.*, 883 F.3d 1 (1st Cir. 2018), does not support its decision. *Ellis* was primarily a duty of loyalty case: plaintiffs alleged that a fund manager bought excessive insurance coverage in a bid to corner the market. *Id.* at 7. As to the duty of prudence, plaintiffs failed to "identify any particular [imprudent] act or omission," and "a wealth of undisputed evidence" showed that the defendant "engaged in an evaluative process prior to making investment decisions." *Id.* at 11. Not so here. The court found disputes of fact as to whether Defendants engaged in a prudent evaluative process.[176] Further, Plaintiffs identified a challenged decision: Defendants' decision to retain the Fund despite it

---

[172] *See* fn. 165, *supra*.

[173] Doc. 272-28 at 14-15; Doc. 273-25 at 2.

[174] Doc. 250-12 at 25; Doc. 250-14 at 40.

[175] Doc. 283-2 at 59 (¶ 81); Doc. 273-25 at 2.

[176] Doc. 343 at 80-83.

failing its objectives.[177] *See Hughes*, 142 S. Ct. at 742 ("If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty."). Thus, *Ellis* is inapposite.

## C. The TS&W Fund

The district court committed similar errors with the TS&W fund: it ignored Plaintiffs' expert's testimony; failed to account for the "character and aims" of the Plan; and inappropriately weighed the evidence.

Plaintiffs adduced substantial evidence that, as early as the start of the Class Period (4/12/2012), the Fund had consistently failed its objectives. As of Q1 2012, the Fund had performed worse than 99% of peers on a 3-year basis and 83% of peers on 5-year basis.[178] By Q2 2012, it had underperformed its benchmark for eight straight quarters on a 3-year basis and for most of the prior nine quarters on a 5-year basis.[179] Moreover, the Fund had a negative five-year information ratio,[180] meaning that it could not even beat its benchmark on a risk-adjusted basis.[181] Dr. Laffer accordingly concluded that a prudent fiduciary would have removed the Fund by the

---

[177] *See* Doc. 250-12 at 25 (opining fund should have been removed after Q3 2012); Doc. 250-14 at 40; Doc. 273-25 at 2.

[178] *See* Doc. 272-29 at 2 (summarizing underperformance); Doc. 283-2 at 37 (¶50); Doc. 272-25 at 48.

[179] Doc. 272-29 at 2; *see also* Doc. 272-28 at 14-15 (failing all IPS objectives).

[180] Doc. 272-28 at 48.

[181] Doc. 250-12 at 20-22 (¶¶ 40, 43).

start of the Class Period, and certainly by June 30, 2012.[182]

Nevertheless, the district court held that Plaintiffs failed to "establish that no prudent fiduciary would have retained the TS&W Fund."[183] It reached this conclusion by wholly ignoring Dr. Laffer's expert opinion.[184] This alone was error. *Moore*, 633 F. App'x at 930; *Tatum*, 761 F.3d at 368 n. 17.

The court also neglected the "character and aim of the particular plan and decision at issue." *Tatum*, 761 F.3d at 367. It held that the Fund's 3- and 5-year performance data pertained to "short-term underperformance" and was insufficient evidence of imprudence as a matter of law.[185] But the Fund's "primary objective"— as explicitly stated in TS&W's agreement with Home Depot—was to outperform its benchmark and peer group on 3- and 5-year bases (which the agreement characterized as "longer term.")[186] Likewise, the Plan's IPS and AHIC both identified the Funds' performance objectives on 3- and 5-year bases.[187] While the

---

[182] Doc. 250-12 at 21-22 ("any prudent fiduciary or investor would exit this investment as quickly as possible."); Doc. 250-14 at 23-24 (same).

[183] Doc. 343 at 91.

[184] *See id.* at 90-93 (not mentioning Dr. Laffer's testimony); s*ee also* Doc. 250-12 at 21-22; Doc. 250-14 at 23-24.

[185] Doc. 343 at 91-92.

[186] *Id.* at 90; Doc. 273-10 at 11; Doc. 283-2 at 31-32 (¶ 44).

[187] *E.g.* Doc. 272-28 at 14-15; Doc. 271-38 at 5 (identifying "five-year time span" for performance); *id.* at 8 (identify market cycle of "three or more years" for performance); Doc. 271-39 at 5, 7 (same).

court cited cases that criticized 3- and 5-year data,[188] none involved a fund, like the TS&W Fund, with express 3- and 5-year objectives. Accordingly, the court improperly analyzed substantive prudence "in the abstract." *GIW Indus.*, 895 F.2d at 732. By substituting its own judgment for the evidence, the court erred.

The court also improperly weighed the evidence. In criticizing Plaintiffs' 3- and 5-year return data, it implicitly accepted Defendants' argument that the Fund "performed well in terms of gross return" on a 10-year basis.[189] But Plaintiffs explained why gross returns were misleading: participants do not earn their returns gross of fees; they earn returns *net* of fees. That is why AHIC presented the IC with performance data *net* of fees[190] and why the SEC requires advisers to market with *net*-of-fee data. 17 C.F.R. § 275.206(4)-1(d)(1). By crediting Defendants' gross data over Plaintiffs' net data, the court weighed the evidence and drew impermissible inferences against Plaintiffs. *Strickland*, 692 F.3d at 1154.

The Court also inappropriately credited evidence that post-dates the challenged investment decision.[191] Plaintiffs presented data from the time of challenged decision: i.e. the period leading up to June 30, 2012.[192] Defendants, by

---

[188] Doc. 343 at 91-92.

[189] Doc. 343 at 90.

[190] *E.g.* Doc. 272-28 at 14 n. 1, 48 n. 1.

[191] Doc. 343 at 92-93

[192] *See* fns. 178-182, *supra*.

contrast, made arguments based on data from 2015—three years *after* Dr. Laffer testified that the Fund should have been removed.[193] Nevertheless, the district court credited Defendants' 2015 arguments over Plaintiffs' 2010-2012 data.[194] This too was error. *See Strickland*, 692 F.3d at 1154; *Tatum*, 761 F.3d at 367 (substantive prudence concerns circumstances "prevailing at the time" of the challenged decision).

### D. <u>The Stephens Fund</u>

As with the other Funds, the court improperly weighed the evidence concerning the Stephens Fund's substantive imprudence, disregarded expert testimony, and drew inferences against Plaintiffs.

Like TS&W, the Stephens Fund's objective was to outperform its benchmark and peer group median over three- and five-year periods.[195] And likewise, Stephens foundered. From Q2 2014 until its last full quarter on the plan (Q3 2017), it underperformed its benchmark in *every quarter* on a three-year basis and every quarter except one (Q3 2014) on a five-year basis.[196] Stephens also consistently

---

[193] Doc. 343 at 92-93.

[194] *Id.*

[195] Doc. 273-20 at 5 (identifying "5-year time span" for evaluating performance relative to peer and benchmark); *id.* at 7 (identifying market cycle of "three or more years" for performance); Doc. 233-3 at 38 (performance objective to beat benchmark by 2.5% over "market cycle," and showing 3- and 5-year return data, net of fees).

[196] Doc. 272-22 at 1.

underperformed relative to peers. By March 31, 2016, it completed its fifth straight quarter performing worse than 75% of peers on a three-year basis and 63% of peers on a five-year basis.[197] The Fund also had a negative information ratio and a Sharpe ratio lower than its benchmark, denoting poor performance on a risk-adjusted basis.[198] Accordingly, Dr. Laffer opines that by March 31, 2016, a prudent fiduciary would have removed the fund.[199] Indeed, from 2014 to 2016, one in four clients (other 401(k) plans) did so.[200]

The court, however, ignored this evidence. Instead, it simply asserted— without citing to the record—that "short-term underperformance does not create a genuine issue of fact."[201] As with the TS&W Fund, the court privileged Defendants' ten-year gross of fee data over Plaintiffs' three- and five-year data.[202] Yet, as with TS&W, using ten-year *gross* data disregards established investment principles— which focus on *net*-of-fee returns[203]—as well as the Plan's goals for the Fund.[204]

---

[197] *Id.*

[198] Doc. 273-17 at 71; Doc. 250-12 at 23-24.

[199] Doc. 250-12 at 23-24.

[200] Doc. 283-2 at 53 (¶ 73); Doc. 273-18 at 3 ("Number of Accounts" column).

[201] Doc. 343 at 96.

[202] *Id.* at 94, n. 258 (referencing Doc. 228-2 (Defs' SUMF) ¶¶ 237-238, but not Plaintiffs' responses to those paragraphs, *see* Doc. 270-1 at 203-206 (¶¶ 237-238)).

[203] Doc. 250-14 at 11, 14, n. 16; *see also* 17 C.F.R. § 275.206(4)-1(d)(1).

[204] *See* fn. 195, *supra*.

Further, the court ignored Dr. Laffer's opinion, baldly averring that expert testimony "did not raise a genuine issue of fact."[205] These were reversible errors. *See Strickland*, 692 F.3d at 1154; *Moore*, 633 F. App'x at 930; *Tatum*, 761 F.3d at 368 n. 17.

## VII.  **Plaintiffs Established Disputes of Fact as to Defendants' Process for Monitoring the Stephens Fund**

The Stephens Fund was the only claim on which the court granted summary judgment as to Defendants' investment process. The court held that that the "IC's meeting minutes and other record evidence clearly reflect the IC's monitoring efforts" and established prudence as a matter of law.[206] Here too, the court erred by construing the evidence in a light unfavorable to Plaintiffs.

Indeed, the record of Defendants' monitoring is sparse between the time the Plan added the Stephens Fund (October 2013) and the time Plaintiffs' expert opines the Plan should have removed it (March 31, 2016). In total, the court's evidence boils down to: (1) AHIC and Stephens offered (unsubstantiated) excuses for the Fund's underperformance at three meetings (for example, that Stephens "protected on the downside");[207] and (2) Committee members asked a total of two questions

---

[205] Doc. 343 at 95.

[206] Doc. 343 at 94.

[207] *See id.* at 94, n. 259 (citing minutes of December 2014 and February 2015 meetings); *id.* at 95 n. 260 (again citing February 2015 meeting); *id.* at 95 n. 261 (citing December 2014 and December 2015 meetings).

about Stephens during the ten meetings that took place between October 2013 and March 31, 2016.[208]

But the court disregarded Plaintiffs' evidence about the poor quality of the Committees' monitoring. Indeed, the IC devoted almost no time to discussing the Stephens Fund or any other Plan investment: in *all of 2015*, it allotted less than one hour for quarterly investment reviews.[209] On the rare occasion when the Committee asked questions, it "passively accepted" AHIC's advice, even when AHIC was plainly wrong. *In re Unisys*, 74 F.3d at 436. For example, the Committee never verified AHIC's false assertions that there were few alternative small cap funds and "no small cap index funds."[210] Nor did the IC probe AHIC's bogus claim that the Fund was "designed to protect on the downside"; in fact, AHIC never presented a downside capture analysis, the Fund underperformed during the 2008 downturn, and even Stephens never claimed that it protected "on the downside."[211]

---

[208] The court cited one question raised at each of the July 2015 and December 2015 meetings. *See* Doc. 343 at 94 n. 257 (citing Doc. 228-2 ¶¶ 242-45). It also cited questions made at two meetings *after* March 31, 2016, *see id.*, the date Plaintiffs' expert opines a prudent fiduciary would have removed the Fund.

[209] Doc. 245-28 at 11-14; Doc. 283-2 at 52-53 (¶ 72).

[210] *See* Doc. 245-22 at 12; Doc. 250-13 at 33 (¶100) (showing 1,478 funds); Doc. 272-18 at 2 (other funds); Doc. 272-19 (Vanguard small cap index fund); *see also* Doc. 270-1 at 209 (¶ 242 response).

[211] *E.g.* Doc. 245-21 at 19 (Stephens not mentioning "protecting on the downside"); Doc. 245-21 at 18; Doc. 245-21 at 16 (no questions about AHIC's "protecting on the downside" claim); Doc. 231-33 at 18, 93 (fund 1.9% below benchmark in 2008; no

Thus, despite statements that AHIC and Stephens made in December 2014, February 2015, and December 2015, there was no evidence that the Committee "conduct[ed] [its] own independent evaluation," of this advice, *Hughes*, 142 S. Ct. at 742, or "balance[d] the relevant factors" to "make a reasoned decision" to retain the Stephens Fund. *George,* 641 F.3d at 796. Instead, the Committee "passively accept[ed] its consultant's positive appraisal…without conducting the independent investigation that ERISA requires." *In re Unisys*, 74 F.3d at 436. There were far too many gaps in the Committee's process for the court to conclude as a matter of law that Defendants engaged in the kind of "careful and perspicacious" analysis that ERISA requires. *Gregg,* 343 F.3d at 843.

## CONCLUSION

A reasonable factfinder could conclude that Defendants shirked the law's "highest" duties. *Herman,* 126 F.3d at 1361. That is what the district court correctly held. Nevertheless, the court erroneously dismissed all Plaintiffs' claims. It reached this flawed result by applying the wrong burden on causation; inappropriately dismissing Plaintiffs' claims for equitable relief; and ignoring key evidence or otherwise viewing the record in a light unfavorable to Plaintiffs. Each of these missteps was reversible error. This Court should now reverse the grant of summary judgment and remand so this case may proceed to trial.

---

upside/downside capture analysis); *see also* Doc. 270-1 at 206-07 (¶ 239 response).

Dated: February 3, 2023                 Respectfully submitted,


                                        */s/ David Tracey*
Charles Field                           David Tracey
**SANFORD HEISLER SHARP, LLP**          **SANFORD HEISLER SHARP, LLP**
2550 Fifth Avenue, 11th Floor           1350 Ave. of the Americas, 31st Floor
San Diego, CA 92103                     New York, NY 10019
Telephone: (619) 577-4253               Telephone: (646) 402-5650
Facsimile: (619) 577-4250               Facsimile: (646) 402-5651
cfield@sanfordheisler.com               dtracey@sanfordheisler.com


T. Brandon Welch                        Leigh Anne St. Charles
**STILLMAN WELCH, LLC**                 **SANFORD HEISLER SHARP, LLP**
3453 Pierce Drive, Suite 150            611 Commerce Street, Suite 3100
Chamblee, GA 30341                      Nashville, TN 37203
Telephone: (404) 895-9040               Telephone: (615) 434-7000
Facsimile: (404) 907-1819               Facsimile: (615) 434-7020
brandon@stillmanwelch.com               lstcharles@sanfordheisler.com


*Counsel for Plaintiffs-Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,628 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word Times New Roman 14-point font.

Dated: February 3, 2023              */s/ David Tracey*
                                     David Tracey

                                     *Counsel for Plaintiffs-Appellants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 3, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system, and served the foregoing by electronic means, via the Court's CM/ECF system, on the following counsel for Defendants-Appellees registered to receive electronic notices.

Roman Martinez
Brent T. Murphy
Charles S. Dameron
**Latham & Watkins LLP**
555 Eleventh Street NW, Suite 1000
Washington, DC 20003
Telephone: 202-637-2200
roman.martinez@lw.com
brent.murphy@lw.com
charles.dameron@lw.com

David Tetrick, Jr.
Darren A. Shuler
Danielle Chattin
**King & Spalding LLP**
1180 Peachtree Street, NE Suite 1600
Atlanta, Georgia 30309
Telephone: (404) 572-4600
dtetrick@kslaw.com
dshuler@kslaw.com
dchattin@kslaw.com

*Attorneys for Defendants-Appellees*

I further certify that on February 3, 2023, I will cause to be mailed four copies of the foregoing to the Clerk of the Court by Federal Express.

Dated: February 3, 2023          */s/ David Tracey*
                                 David Tracey

                                 *Counsel for Plaintiffs-Appellants*